IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA DEEL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 1745 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| AMERITECH LONG TERM DISABILITY PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Paula Deel ("Deel"), a former employee of Ameritech Corporation, was in a serious motor vehicle accident that left her with chronic back pain. Asserting that her chronic back pain prevented her from performing any work, Deel made a claim for long term disability benefits from the Ameritech Long Term Disability Plan (the "Plan"). The Plan denied Deel's claim for benefits. Over seven and a half years later, Deel brought this action against the Plan to challenge its decision to deny her claim for benefits. Now before the Court are the parties' Motions for Judgment on the Administrative Record. For the reasons set forth below, Deel's Motion is denied and the Plan's Motion is granted.

**FACTUAL BACKGROUND**

A.  Deel's Injury and her Claim for Disability Benefits.

Deel was employed by the Illinois Bell Telephone Company as a full-time customer service representative from January 8, 1991 to July 25, 1996. (Answer at ¶ 8). On July 18, 1995, Deel was involved in an automobile accident in which her car, while stopped at a red light, was rear-ended

by another vehicle that was traveling at 40 miles per hour. (AR 00063, 00445)[1] Following the accident, Deel began experiencing pain throughout her back with pain and numbness radiating into her legs. (AR 00063) Deel applied for and was awarded short-term disability benefits from Ameritech's Sickness and Accident Disability Benefits program as of July 25, 1995. (AR 00032) Deel received short-term disability benefits under that plan from July 26, 1995 to July 24, 1996, the maximum 52-week period permitted under that plan. (AR 00032; AR 00442)

When Deel's short-term disability benefits were about to expire, she filed a claim for long-term disability benefits under the Plan. (AR 00443) In her application for long-term disability benefits, Deel provided information regarding her condition, including the names of doctors who had been treating her and a statement from her primary orthopedic surgeon, Dr. Jeffrey Piccirillo ("Dr. Piccirillo"), opining that Deel was totally disabled for her occupation as well as any other occupation. (AR 00445; AR 00448) Deel further supported her claim with medical records spanning the time period July 1995 - June 1996. Deel's medial records for that time period demonstrate a history of not less than 11 visits to Dr. Piccirillo and a second doctor – Dr. Mikuzis – in which she complained persistently of back pain, numbness, tingling and burning in her legs, sleeping problems, difficulty walking, and urinary and bowel incontinence despite a course of treatment that included three epidural steroid injections, pain medication, and physical therapy. (AR

---

[1]The facts as presented in this Memorandum Opinion and Order are taken from the administrative record. As discussed below, because this Court reviews the administrator's decision in this ERISA case under the arbitrary and capricious standard, the Court's review is necessarily limited to the administrative record. *See Reich v. Ladish Co.*, 306 F.3d 519 at 523, n. 1 (7th Cir. 2002) (citing *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) for the proposition that "under the arbitrary and capricious standard, our review is limited to the administrative record").

00054 - 90) Deel's medical records indicate that Deel's back pain worsened throughout this time period, despite treatment. *Id.*

As of June of 1996, Dr. Piccirillo had not found the cause, or etiology, of Deel's chronic back pain despite a number of diagnostic tests, including two myelographies (a radiography of the spinal cord and nerve roots), a CT scan of the spine and neck, and an EMG/NCV.[2] (AR 00045; 69; 77) Deel's first myelography – on January 3, 1996 – revealed a small anterior defect at the L4-L5 level and also some amputation to the left L5 nerve root at the L4-L5 disc space level. *Id.* at 00069. Deel saw Dr. Mikuzis for her EMG/NCV on January 8, 1996. Dr. Mikuzis noted, among other things, that Deel had (1) downgoing toes bilaterally; (2) a loss of knee jerk reflex on the right; and (3) low sural nerve amplitudes and low to mildly prolonged latencies on the right side. *Id.* at 00077. In March 1996, a CT scan of the spine and neck coupled with a second myelography, revealed "mild anterior extradural defects seen at the levels of C-3/C-4, C-4/C-5, C-5/C-6, and C-6/C-7." *Id.* at 00075. The defects produced "mild anterior indentation on the thecal sac . . . due to mild posterior osteophyte and associated bulging of the discs." *Id.* There were also "mild anterior extradural defects seen in the lower lumbar spine at the levels of L-3/L-4, L-4/L-5, and L-5/S-1." *Id.* Deel's medical records indicate that these "do not produce any nerve root indentation or amputation." *Id.*

Deel's doctors could not find any objective tests or findings that could explain her subjective complaint of low back pain. (AR 00126) X-rays of Deel's neck, chest and pelvis were normal. *Id.* at 00088. An August 24, 1995 MRI showed some degenerative changes in Deel's spine, but offered

---

[2]An "EMG" is an electromyogram, which measures the electrical activity of muscles at rest. An "NCV" is a nerve conduction velocity study, which measures how well and how fast the nerves can send electrical signals. Both are diagnostic tools that are often done together to provide more complete information than the individual tests. The tests are used to diagnose herniated discs, among other things. *See* http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

3

no evidence of a herniation or that any of the nerve roots that come off the spinal cord were pressed or pinched. *Id.* at 00098-90; 00117; 00153; 00187; 00190-193; 00196. On January 11, 1996, Dr. Piccirillo noted that Deel had undergone a CT that was essentially negative and an EMG/NCV that showed no conduction delays. Accordingly, Deel's physicians concluded that she suffered from myofascitic pain in the neck and back, which is a recently-developed diagnosis that is used to explain the subjective findings of back pain without the objective positive findings and studies. *Id.* at 00098 - 00101; 00129. The diagnosis is one of exclusion – a catchall diagnosis for patients that have subjective complaints of pain that cannot be explained by test results. *Id.* at 00130-31.

On June 11, 1996, Dr. Piccirillo opined that Deel was completely disabled for her occupation and for any occupation due to her chronic pain. (AR 00448) However, Dr. Piccirillo, in the same document, also opined that Deel had no limitation with respect to seven occupational activities: (1) reaching (forward/overhead); (2) pushing/pulling/twisting (arm/leg controls); (3) grasping/handling; (4) finger dexterity; (5) repetitive movements (hands/feet); (6) operating electrical equipment; and (7) concentrated visual attention. *Id.* at 00447. He further opined that Deel was a suitable candidate for vocational rehabilitation and for therapeutic rehabilitation. *Id.* at 00448.

The plan administrator denied Deel's claim for disability benefits on September 4, 1996, noting a litany of objective tests indicating normal results and finding that Deel did not meet the definition of disability as noted in the Plan. (AR 00389) On September 14, 1996, Deel wrote a letter to the plan administrator appealing its decision to deny her claim for disability benefits. *Id.* at 00385 - 00388. In the letter, Deel reiterated her symptoms and noted that she had been found to be disabled by the Social Security Administration ("SSA"). *Id.* The plan administrator responded by letter dated November 15, 1996, advising Deel that the disability determination made by the SSA

did not have an impact upon its determination that Deel was ineligible for disability benefits under the plan. *Id.* at 00383. The plan administrator noted that "we do not have objective medical evidence which would enable us to re-evaluate your claim" and indicated that Deel should submit such evidence "supportive of [her] diagnosis" within 30 days if she hoped for a different result upon re-evaluation of her claim. *Id.*

On June 20, 1997, Deel, through counsel, sent the Plan administrator another letter detailing the basis for her claim for disability benefits and requesting, among other things, a copy of the Plan governing her claim. (AR 00364 - 67) On August 19, 1997, the Ameritech Disability Service Center ("ADSC") sent Deel's counsel what it represented to be a "complete copy of Ameritech's nonsalaried LTD Plan," which document was dated January 1988. *Id.* at 00351 - 58. After Deel filed her complaint in this case, Defendant produced an Administrative Record that contained, as Exhibit 1, a version of the Plan dated June 1, 1996. *Id.* at 00003 - 18. Deel asserts that the June 1, 1996 version of the Plan had not been provided previously to her at any time. (Deel Mem. in Support of Mtn. for Judgment on Admin. Rec. at 7).

On December 31, 1997, Deel sent another letter to ADSC with additional evidence and argument as to why she believed she met the definition of "disabled." (AR 00347 - 49) Deel's additional evidence included transcripts of depositions of Deel's doctors that were taken during the course of a personal injury lawsuit relating to Deel's automobile accident. On May 5, 1998, ADSC sent a letter to Deel's counsel denying her appeal. *Id.* at 00297 - 98. The ADSC advised Deel that it based its decision to deny her claim upon a review of her medical records that was conducted by a physician specializing in occupational medicine. That physician, Dr. Avrim Simon, concluded that: (1) he had no up-to-date information regarding Deel's condition; and (2) after reviewing notes

5

from Deel's treating doctors, diagnostic imaging, SSI letters, attorney communications and deposition transcripts (also of treating doctors), there were no objective findings to support any lumbar or cervical condition other than the "somewhat nebulous condition of Myofascial pain syndrome." *Id.* at 00025. He further concluded that Deel's medical records did not support her claim of urinary incontinence. Dr. Simon noted that myofascial pain syndrome is a "condition whereby patients complain of chronic, often disabling, pain that is not supported by objective findings." *Id.* Dr. Simon opined that Deel could be employed in certain sedentary occupations and that she might benefit from physical therapy and/or psychological counseling. *Id.* The ADSC credited that finding, noting that "[t]he medical review of the claim file provided supported that the claimant can be employed in some sort of sedentary position" involving minimal to no light lifting and a stretch or position change at regular intervals. *Id.* at 00298. At that point, the record before the ADSC included the results of a labor market survey performed by WorkSource International. *Id.* at 00302-07. That study indicated the availability of several positions that required only "occasional standing/walking and could be performed primarily sitting with the option to change positions at regular hourly intervals" with the additional occasional requirement of "lifting/carrying up to 10 pounds." *Id.* at 00303.

On July 2, 1998, Deel appealed this denial to Ameritech's Employee Benefit Committee (the "EBC"), the final internal appeal body for the Plan. That appeal was also denied. By letter dated September 30, 1998, the EBC advised Deel that it had reviewed the records provided by Deel and that it "did not observe physical findings or results of diagnostic testing that demonstrate the presence of a disabling condition." (AR 00023) The EBC noted that Dr. Piccirillo reported that "we

6

still have not found the etiology of [Deel's] pain;" this the EBC took as an indication that the proper objective findings did not exist to support Deel's claim.

B.      Provisions in the 1988 and 1996 Versions of the Plan.

The 1988 Version of the Plan (the "1988 Version") that the ADSC provided to Deel's counsel on August 19, 1997 defines "disability" as:

> sickness or injury, other than accidental injury arising out of and in the course of employment by the Company, which [sic] prevents the employee from engaging in any occupation or employment, for which the employee is qualified, or may reasonably become qualified, based on education training and experience. An employee shall continue to be considered disabled if deemed to be incapable of performing the requirement of a job other than one whose rate of pay is less than 50% of the employee's base pay at the time the disability commenced . . .

(AR 00353) The 1988 Version further provides that "[b]enefits shall not be paid for any period of disability during which the eligible employee is not under the care of a legally qualified physician." *Id.* at 00357. With respect to claim and appeal procedures, the 1988 Version provides that "[t]he Plain Carrier shall determine conclusively for all parties all questions arising in the administration of the Plan." *Id.*

The 1996 Version of the Plan (the "1996 Version") defines "disability" as:

> illness or injury, other than accidental injury arising out of and in the course of employment by the Company, or a Participating Company, supported by objective medical documentation, that prevents the Eligible Employee from engaging in any occupation or employment (with reasonable accommodation as determined by the Company or its delegate), for which the Eligible Employee is qualified, or may reasonably become qualified, based on education training and experience. An employee shall continue to be considered disabled if prevented by reason of such illness or injury, supported by objective medical documentation, from working at a job which [sic] pays wages which [sic], when combined with benefits payable from the Plan, equal less than 75% of the Eligible Employee's Base Pay at the time the Disability occurred.

7

(AR 00016) The 1996 Version provides that disability benefits are not payable if an Eligible Employee "fails to furnish objective medical documentation of [the disabling condition]." *Id.* at 00012. The 1996 Version further provides that "[b]enefits shall not be paid for any period of Disability during which the Eligible Employee is not under the care of a licensed physician." *Id.* at 00009. With respect to the responsibilities of the EBC, the 1996 Version provides that:

> The Committee has full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to the Plan benefits in accordance with Plan terms. The Committee shall determine conclusively for all parties all questions arising in the administration of the Plan and any decision of the Committee shall not be subject to further review.

*Id.* at 00011.

### STANDARD OF REVIEW

Under ERISA, a district court reviews a plan's denial of benefits *de novo* unless the benefit plan gives the plan administrator clear discretion to construe policy terms and determine the eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir 2000). "If the administrator of the employee benefits plan at issue has 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' a decision to deny benefits can only be overturned if it was arbitrary and capricious." *Levar v. Steelworkers Pension Trust*, No. 07 C 212, 2008 U.S. Dist. LEXIS 6270, *13-14 (N.D. Ill. Jan. 28, 2008) (quoting *Bruch*, 489 U.S. at 115). The Seventh Circuit provided the drafters of plan documents with "safe harbor" language in its opinion in *Herzberger*; there, the court advised that a plan providing that "[b]enefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them" will "not be open to being characterized as entitling the applicant for benefits to plenary judicial review of a decision

8

turning him down." 205 F.3d at 331 (citing *Cozzie v. Met. Life Ins. Co.*, 140 F.3d 1104, 1107 (7th Cir. 1998)).

While the Seventh Circuit has strongly encouraged the use of *Herzberger's* "safe harbor" language, "its absence does not compel the conclusion that the administrator does *not* have discretion." *Diaz v. Prudential Ins. Co.*, 424 F.3d 635, 637 (7 th Cir. 2005) (citing *Herzberger*, 205 F.3d at 331). Instead, the Seventh Circuit has recognized that:

> There is a substantive difference between plans without discretion, for which the standard of review is *de novo* under *Bruch*, and those with discretion, for which review is deferential. The former plans reflect the fact that the applicant must meet the prescribed requirements of the plan, through appropriate evidence. . . . The latter plans communicate the idea that the administrator not only has broad-ranging authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely.

*Id.* at 639. The critical question is "whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Id.* at 639-40.

In this case, the Plan argues that the 1996 Version of the Plan dictates the standard of review because, it argues, the ERISA plan in effect at the time the applicant's claim for benefits is denied governs the claim for benefits and the scope of the plan administrator's decision. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). For her part, Deel argues that the 1988 Version of the Plan applies because the ADSC provided that document to her in response to her counsel's request for a copy of the Plan. Because the ADSC gave her the wrong document, Deel argues, she never had notice of an important Plan provision and, as such, the Plan should be estopped from benefitting from language in the 1996 Version, which Deel concedes contains language sufficient to place participants on notice that the arbitrary and capricious standard

9

will apply. Deel relies on *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1024 (7th Cir. 1998), which stands for the proposition that a participant or beneficiary may rely on a summary plan description ("SPD") and estop a plan administrator from denying coverage for terms found in the underlying policy when there is a direct conflict between an SPD and the underlying policy. Deel insists that the language in the 1988 Version does not give the Plan discretionary authority and, accordingly, if the Court determines that the 1988 Version controls, the standard of review should be *de novo*.

The Court need not resolve the question whether the 1988 Version or the 1996 Version controls on this point because both plans give participants adequate notice that the plan administrator has discretionary authority to determine eligibility for benefits or to construe the terms of the plan. As noted above, Deel concedes that the 1996 Version confers such notice. The 1988 Version of the Plan provides that "[t]he Plain Carrier shall determine conclusively for all parties all questions arising in the administration of the Plan." (AR 00353) As the Plan notes, the Seventh Circuit has held that the language "[t]he Committee shall determine conclusively for all parties all questions arising in the administration of the [Plan]" is sufficient to confer discretionary authority. *Swaback v. Am. Info. Technologies Corp.*, 103 F.3d 535, 540 and n.7 (7th Cir. 1996). Deel argues that *Swaback* was decided before *Herzberger* and that, post-*Herzberger*, the cited language from *Swaback* is no longer sufficient to confer discretionary authority.

The Court finds that the language used in the 1988 Version is sufficient – even post-*Herzberger* – to confer discretionary authority. As the Seventh Circuit has made clear since its decision in *Herzberger*, the critical question is "whether the plan gives the employee adequate notice that the plan administrator . . . has the latitude to shape the application, interpretation, and content

10

of the rules in each case." *Diaz*, 424 F.3d at 639-40. The Court does not read *Herzberger* to suggest that the language in *Swaback* no longer suffices to give employees such adequate notice. Instead, the Court finds that the language used in the 1988 Version, like the language used in *Swaback*, gives plan participants adequate notice that the plan administrator will make conclusive determinations for all parties with respect to "*all questions* arising in the administration of the plan." The 1988 Version clearly communicates to plan participants that the plan administrator will not just be making judgments within the confines of pre-set standards, but instead will be making final decisions with respect to *all questions*, which undoubtedly includes questions regarding the application, interpretation and content of the rules. Because the Plan confers discretionary authority upon the plan administrator, the decision to deny Deel's claim for benefits will be overturned only if it was arbitrary and capricious.

## DISCUSSION

**I.      The Decision to Deny Benefits in this Case was Not Arbitrary and Capricious.**

Under the highly deferential arbitrary and capricious standard, courts "will overturn a plan administrator's decision 'only . . . if it is downright unreasonable.'" *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (quoting *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005)). The Court will not substitute the conclusion it would have reached for the decision of the plan administrator "as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Id.* "Despite the deferential nature of this standard however, it 'is not a rubber stamp' and a denial of benefits will not be upheld 'when there is an absence of reasoning in the record to support it.'" *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007) (citing *Hackett v. Xerox Corp. Long-Term Disability*

11

*Income*, 315 F.3d 771, 773 (7th Cir. 2003)). This Court will uphold the Plan's determination "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Id.* at 321-22 (quoting *Sisto v. Ameritech Sickness & Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

The Plan argues that its decision to deny benefits to Deel was not arbitrary and capricious because Deel failed to provide objective medical documentation to support her disability claim. Essentially, the plan argues that because Deel has not provided objective evidence to support a specific cause or etiology for her subjective complaints of low back pain, her claim for disability benefits was properly denied. But the Seventh Circuit has rejected that argument. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 320 (7th Cir. 2007) ("under *Hawkins*, the Plan could not deny Williams's application for benefits solely on the basis that fatigue [or, in this case, pain] is subjective. As the district court correctly determined, it was thus improper for the Plan to initially deny benefits to Williams on the basis that his subjective symptoms of fatigue [pain, in this case] did not lend themselves to medical diagnosis") (citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)). The Seventh Circuit recognizes that "[a] distinction exists . . . between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Williams*, 509 F.3d at 322. As such, denying Deel's claim on the basis that she failed to provide objective evidence regarding the *cause* of her pain would be improper, but a denial based upon a failure to produce objective evidence

12

demonstrating the extent to which her pain limits her functional capabilities would not be. *See id. at* 323 ("Because Williams's functional limitations due to his fatigue could be objectively measured, the Plan did not act arbitrarily and capriciously in denying Williams's initial application or appeal on the basis that the record lacked accurate documentation in this regard.").

The Plan also argues that its decision to deny benefits was not arbitrary and capricious because the evidence demonstrates that Deel is capable of sedentary work. The Plan points first to Dr. Piccirillo's Statement of Functional Capacity.[3] (AR 00447) In that statement, Dr. Piccirillo opines that Deel is totally disabled only after indicating that Deel's condition in no way limits her functional capacity with respect to: (1) reaching (forward/overhead); (2) pushing/pulling/twisting (arm/leg controls); (3) grasping/handling; (4) finger dexterity; (5) repetitive movements (hands/feet); (6) operating electrical equipment; and (7) concentrated visual attention. *Id.* Dr. Piccirillo also indicates only some limitation (less than a moderate limitation) of Deel's functional capacity with respect to sitting. *Id.* Further, when another of Deel's doctors, Dr. Mikuzis, was asked at a deposition whether he would expect Deel to return to work at some point, he testified, "I would hope so. From what I understand of her job, it was more of a sedentary or very light level. And given proper seating, given proper ability to take breaks or change body positions, *she should be able to get back to at least part time work*." (AR 00253) (emphasis added) Consistent with that view, Dr.

---

[3]The Plan also points to Deel's Statement of Claim questionnaire and argues that Deel indicated therein that she was capable of sitting, extended reaching forward, fine hand dexterity, highly repetitive motions, fine visual and auditory attention, and precise verbal/written communication for over 60% of a normal work day. Deel's Statement of Claim admits no such thing. (AR 00447) The portion of that document to which the Plan refers appears under the heading, "Current Occupational Requirements." Deel correctly notes that the Statement of Claim questionnaire that Deel completed asks nothing at all about what the applicant is physically capable of doing, but instead asks the applicant to describe "Current occupational Requirements" in terms of "Employee Exposure To" certain conditions and in terms of certain specific "Required Activities." Accordingly, Deel's check marks on that document to not describe her functional capabilities, but instead denote the requirements of her then-current occupation.

13

Piccirillo also indicated that he believed Deel to be suitable for vocational and therapeutic rehabilitation. (AR 00448) The record also contains the labor market survey performed by WorkSource International that indicates that, at the time the report was drafted, there were a number of available positions within thirty miles of Deel's location that required only "occasional standing/walking and could be performed primarily sitting with the option to change positions at regular hourly intervals" with the additional occasional requirement of "lifting/carrying up to 10 pounds." *Id.* at 00303. Dr. Piccirillo's assessment of Deel's physical capabilities with respect to specific activities indicates that Deel could tolerate such a position. Finally, Dr. Simon opined, after reviewing Deel's medical records, that she could be employed in certain sedentary occupations.

In the face of this record, Deel is left to argue that the decision to deny her claim for benefits should be overturned as arbitrary and capricious because the record also includes her subjective complaints of constant pain and because Dr. Piccirillo has opined that she is completely disabled. But there is a seeming contradiction between Dr. Piccirillo's assessment that Deel's condition does not limit her functional capacity with respect to: (1) reaching (forward/overhead); (2) pushing/pulling/twisting (arm/leg controls); (3) grasping/handling; (4) finger dexterity; (5) repetitive movements (hands/feet); (6) operating electrical equipment; and (7) concentrated visual attention and his conclusion that Deel is completely disabled for any occupation. Indeed, Dr. Piccirillo's assessment that Deel is not limited with respect to the above seven physical activities is consistent with Dr. Simon's opinion that Deel could be employed in certain sedentary occupations. And the labor market survey performed by WorkSource International that indicates the availability of a number of positions in Deel's area that would be sufficiently sedentary to accommodate Deel's limitations. Accordingly, in that evidentiary context, it was not downright unreasonable for the Plan

14

to deny Deel's claim for benefits on the ground that the evidence demonstrates that Deel is capable of sedentary work. Or, stated another way, it was not downright unreasonable for the Plan to deny Deel's claim for benefits because she failed to demonstrate that her condition prevents her from engaging in any occupation or employment, for which she is qualified, or may reasonably become qualified, based on her education training and experience. Because the Court concludes that the Plan's decision to deny benefits on this basis was not downright unreasonable, the Court need not consider the Plan's additional argument that it appropriately denied Deel's claim for her failure to demonstrate that she has been under the constant care of a physician since 1996.

## CONCLUSION

For the reasons stated herein, Deel's Motion for Judgment on the Administrative Record is denied and the Plan's Motion is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: February 29, 2008